937 F.2d 443
 Elisabeth SYBRANDY, Pieter Sybrandy, Husband and Wife,
Plaintiffs-Appellees,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE, AGRICULTURAL
STABILIZATION AND CONSERVATION SERVICE,
Defendant-Appellant (Two Cases).
Elisabeth SYBRANDY, Pieter
Sybrandy, Husband and Wife,
Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF AGRICULTURE, AGRICULTURAL
STABILIZATION AND CONSERVATION SERVICE, Defendant-Appellee.
 Nos. 90-35056, 90-35555 and 90-35556.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 4, 1991.
Decided June 24, 1991.
 
 Susan M. Sleater, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant-cross-appellee.
 Mark E. Fickes, Velikanje, Moore & Shore, Yakima, Wash., for plaintiff-appellee-cross-appellant.
 Appeal from the United States District Court for the Eastern District of Washington.
 Before WRIGHT, FARRIS and THOMPSON, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 The United States Department of Agriculture appeals the district court's order of summary judgment in favor of Pieter and Elisabeth Sybrandy. The Sybrandys challenge the Department of Agriculture's determination that they violated Dairy Milk Production Termination Program requirements. We reverse.
 
 Background
 
 2
 The Dairy Milk Production Termination Program, 7 U.S.C. Sec. 1446(d), was enacted by Congress in 1985. The Termination Program represents Congress's current approach to a long-standing national policy of regulating the market for milk products. In the past, Congress sought to stabilize market prices for dairy goods through a system of price supports. Because of problems with accumulating excess inventories of milk products, Congress modified its policy and began efforts to decrease the production of milk. The Termination Program was designed to "avoid the creation of burdensome excess supplies of milk or milk products." 7 U.S.C. Sec. 1446(d)(3)(B). Under the program, the government pays dairy farmers to refrain from producing milk. In return for payment, producers who participate in the program contract to (1) dispose of their herds, (2) forego any ownership interest in dairy production for five years, and (3) not "make available" for milk production the producer's facilities for the same period. 7 U.S.C. Sec. 1446(d)(3)(A)(iv). Section 1446(d)(3)(A) (iv)(III) provides that any producer who enters into a contract with the Secretary of Agriculture pursuant to the Termination Program and fails to comply with such terms "shall repay to the Secretary the entire payment received under the contract, including simple interest...." Section 1446(d)(5)(B)(i) also authorizes the Secretary to impose a civil penalty of $1000 on a person who "knowingly violates" the statute or regulations issued under the statute.
 
 
 3
 The Sybrandys purchased a dairy farm in eastern Washington in 1979. They purchased the farm on a land sales contract, making an initial downpayment and agreeing to make monthly payments to the former owner who continued to make payments on the preexisting mortgage. The Sybrandys' farming operation ran into trouble in the mid-80's due in part to a diseased herd and dropping milk prices. They became interested in the Termination Program, and, on April 1, 1986, they were accepted for the program. The Sybrandys sold their herd as required by the program contract and received $66,000. In return for their promise to forego any ownership interest in dairy production for five years and to not "make available" their facilities for milk production for the same period, the government paid the Sybrandys $236,000 in September of 1986. This amount constituted 80% of the total five-year contract price. They were to receive $14,787 in each of the next four years, for a total of $295,741.04, under the program contract.
 
 
 4
 The Sybrandys used $210,000 of the initial payment to pay off debts to a creditor bank. The next month, October, 1986, the Sybrandys defaulted on their land sales contract. They paid only $500 of the $2316 monthly installment and made no further payments on the dairy farm. The former owner of the farm foreclosed, and the Sybrandys lost control of the farm in May of 1987. In July of 1987, the land was rented to another dairy farmer who began dairy production.
 
 
 5
 On July 21, 1987, the Secretary notified the Sybrandys that they were in violation of their Termination Program contract because the contracted dairy facility was being used to maintain dairy cows. Pursuant to section 1446, the Secretary required that the Sybrandys return all payments made under the plan and imposed a $1,000 penalty. The payment due on that date was $249,455.66, which was the total of the $236,592.80 previously forwarded by the government plus $11,862.86 in interest and the $1000 fine. The $66,000 received by the Sybrandys for the sale of their herd is not at issue.
 
 
 6
 The Sybrandys appealed through the administrative process, and, on June 20, 1988, the Washington D.C. Headquarters of the Agricultural Stabilization and Conservation Service issued a final decision holding the Sybrandys in violation of the program contract.
 
 
 7
 The Sybrandys appealed to the federal district court in the Eastern District of Washington. In an oral ruling, Judge McDonald held that the Sybrandys had not violated program requirements. The district court reversed the administrative order and reserved the question of whether to grant the Sybrandy's request for attorney fees. This appeal followed.
 
 Standard of Review
 
 8
 The district court's grant of summary judgment is reviewed de novo. In re Softalk Pub. Co., Inc., 856 F.2d 1328, 1330 (9th Cir.1988).
 
 Discussion
 
 9
 7 U.S.C. Sec. 1446(d)(3)(A)(iv)(II) provides that producers participating in the Termination Program shall contract to not "make available to any person, [for a period of five years], any milk production capacity of a facility that becomes available because of compliance by a producer with [the Termination Program] unless the Secretary shall by regulation otherwise permit."
 
 
 10
 Pursuant to his authority to implement the Termination Program, the Secretary of Agriculture has issued a number of regulations which more specifically articulate the requirements dairy farmers must satisfy under the program. 7 C.F.R. 1430.457(d) specifies that contracted land must not be used to produce milk or maintain dairy cattle during the nonproduction period:No milk production facility on any unit with respect to which any participating producer ... was a producer on or after January 1, 1986, may be used by any person to produce milk or to maintain dairy cattle during the nonproduction period.
 
 
 11
 This regulatory provision was expressly incorporated into the Termination Program contract signed by the Sybrandys.
 
 
 12
 Because the contracted production facility was used for milk production during the nonproduction period, the Department of Agriculture found the Sybrandys in violation of their contract.
 
 
 13
 Judge McDonald, looking to the "make available" language of the statute, interpreted the Termination Program contract to require that the Sybrandys not voluntarily make available the facilities for milk production. Analogizing the Sybrandys' loss of the farm through bankruptcy to having the ranch "taken away from them at gunpoint," the district court held that the Sybrandys were not in violation of the Termination Program requirements.
 
 
 14
 7 C.F.R. 1430.458(d) unequivocally states that the contracted facility is not to be used for milk production during the nonproduction period. The Sybrandys contend that the absolute requirement set forth in this regulation exceeds the scope of authority vested in the Secretary by 7 U.S.C. Sec. 1446(d). The Sybrandys argue that Congress has authorized the Secretary only to ensure that program participants not "make available" a contracted facility and that this "make available" language connotes voluntariness.
 
 
 15
 The scope of the mandate that program participants not "make available" a contracted facility (7 U.S.C. Sec. 1446(d)(3)(A)(iv)(II)) is ambiguous. We accord substantial deference to the interpretation of an authorizing statute by the agency authorized with administering it. Rust v. Sullivan, --- U.S. ----, ----, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Secretary's interpretation may not be disturbed if it reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress's expressed intent. Rust, --- U.S. at ----, 111 S.Ct. at 1767; Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82.
 
 
 16
 The Secretary's interpretation of the statute as imposing a requirement that facilities contracted under the Termination Program not be used for dairy production purposes during the five-year nonproduction period is a plausible construction of the statute.
 
 
 17
 7 C.F.R. 1430.457(d) also fulfills congressional intent. The Termination Program is not a grant program designed to subsidize dairy farmers. Rather, the Termination Program allocates federal funds for the specific purpose of stabilizing the dairy market by strategically restricting the production of dairy products. When the contracted land is used to produce milk, the purpose of the Termination Program is frustrated.
 
 
 18
 The Sybrandys allege that the intent of the Termination Program has not been frustrated in this instance because the contracted farm is currently being operated by a farmer who was previously producing. We understand but reject the argument. The non-participating farmer may have increased his output through use of the facility, or a new farmer may be using the non-participating farmer's former facilities. Either way, the number of dairy facilities which are, or may be, used to produce milk has increased.
 
 
 19
 Rather than frustrating congressional intent, the Secretary's interpretation of the program requirements is more aligned with the purposes of the Termination Program than the construction given by the district court. Under the district court's reading of the statute, the government is required to pay the Sybrandys a significant sum despite the fact that the purposes for which payment was made are not being fulfilled.
 
 
 20
 7 C.F.R. 1430.457(d) is a valid regulation. The Secretary could properly determine that the Sybrandys violated the requirements of the Termination Program.
 
 
 21
 The administrative order requiring the Sybrandys to return all payments received under the program with interest and imposing a $1000 penalty was proper under 7 U.S.C. Sec. 1446(d)(3)(A)(iv)(III), 7 U.S.C. Sec. 1446(d)(5)(B)(i), and the express liquidation terms of the contract.
 
 
 22
 REVERSED.